IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 16-21156-civ-COOKE/TORRES

JASON PIERRE-PAUL,

   Plaintiff,

vs.

ESPN, INC., a foreign corporation;
and ADAM SCHEFTER, an individual,

   Defendants.

_____/

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

LEVINE SULLIVAN KOCH & SCHULZ LLP

Nathan Siegel (*admitted pro hac vice*)
nsiegel@lskslaw.com
Adam Lazier (*admitted pro hac vice*)
alazier@lskslaw.com
1899 L Street, NW  Suite 200
Washington, DC 20036
Phone:  (202) 508-1100
Fax:  (202) 861-9888

THOMAS & LoCICERO PL

Deanna K. Shullman (Fla. Bar No. 514462)
dshullman@tlolawfirm.com
Allison S. Lovelady (Fla. Bar No. 70662)
alovelady@tlolawfirm.com
401 SE 12th Street, Suite 300
Fort Lauderdale, FL  33316
Phone:  (954) 703-3416
Fax:  (954) 400-5415

*Attorneys for Defendants*

Plaintiff's case is based on the premise that the law should "expect ESPN to protect" the athletes it covers. [D.E. 18 ("Opp.") at 1]  This gets the role of the press backwards: the First Amendment envisions "a vigilant and courageous press," *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 720 (1931), not one that gives celebrities a veto over how newsworthy events may be reported.  In fact, the First Amendment protects truthful reporting on matters of public concern in order to avoid exactly the sort of "timidity and self-censorship" Plaintiff seeks to promote. *Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989) (citation omitted).

Otherwise, Plaintiff's arguments essentially boil down to two propositions: (1) the law cares more about medical records than the information they contain, and (2) Schefter "unlawfully obtained" the images because he allegedly knew they were not supposed to be disclosed to him. Both propositions are simply wrong, and contradict every applicable statute, case, and principle of common sense.  The case is thus ripe for dismissal.

I.   **PLAINTIFF FAILS TO STATE A CLAIM UNDER FLORIDA LAW**

First, this Court need not even reach any First Amendment issue, because the Complaint fails as a matter of Florida law.  Before we address the specifics of each cause of action, however, as noted above, the Opposition relies heavily on a supposed distinction between Defendants' admitted right to report the *information* conveyed by Schefter's tweet – "the amputation of Plaintiff's right index finger" (Opp. 10) – and the allegedly tortious posting of images of medical records to corroborate this information.  Opp. 1.  Plaintiff grounds this distinction on the assertion that "the entire purpose of HIPAA and Florida Statute § 456.057 is to *prevent* the disclosure of private and confidential medical records", Opp. 10, a point that he makes over and over, *id.* 1, 9, 10, 11, 12, 16.

But Plaintiff is simply wrong.  Those statutes exist to prevent the disclosure of medical *information*, and they recognize no distinction between the fact of an amputation and a record of it.  Fla. Stat. § 456.057(11) protects "*any information* in the medical record."  It "therefore prohibit[s] more than the production of a nonparty patient's medical records without notice; [it] also prohibit[s] *discussion about a nonparty patient's medical condition* without prior notice to that nonparty."  *Crowley v. Lamming*, 66 So. 3d 355, 358 (Fla. 2d DCA 2011) (emphasis in original).  Likewise, HIPAA protects all "individually identifiable health information."  *See* 45 C.F.R. § 164.502(a).  Nor does Plaintiff explain why any sensible medical privacy regime would

recognize the distinction he posits.  The privacy interest those laws protect are the facts about diagnosis and treatment, not the form in which facts may also be documented.

What the law also makes clear, however, is that Florida's common law of privacy (and the First Amendment) provides that where medical information relates to a matter of public concern it may be reported, and so courts resolve that question without regard to whether the defendant disclosed information or records.  For example, Plaintiff cites *Doe v. Univision*, 717 So. 2d 63 (3d DCA 1998), but that case held a television station potentially liable for disclosing information about the plaintiff's plastic surgery, not any surgical records.  On the other hand, in *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200 (1998), the California Supreme Court dismissed the plaintiff's private facts claim over a documentary featuring footage of her medical treatment after a car accident.  *Shulman* placed no emphasis on the fact that the defendant did not disclose the plaintiff's actual records. *Id.* at 214-30.  Rather, in both cases the matter turned on whether the medical information at issue related to a matter of public concern – not on the form in which it was disclosed.[1]  *See also Bartnicki v. Vopper*, 532 U.S. 514, 534 ("[P]rivacy concerns give way when balanced against the interest in publishing matters of public importance.").

If, as Plaintiff argues, his privacy rights as set forth in state and federal statutes really overrode Defendants' right to report on his condition, Plaintiff would have a cause of action even if Mr. Schefter had not included the images with his tweet.  But Plaintiff rightfully concedes that is not so, because the news report obviously relates to a matter of public concern.  Because ESPN's rights to report about his medical care overrode his medical privacy rights, Defendants were well within their rights to make the editorial judgment to disclose all the information they had to support the accuracy of their news story.

      A.      **Plaintiff has not Stated a Claim for Invasion of Privacy Because the Tweet Related to a Matter of Public Concern**

Under Florida law, a plaintiff asserting a private facts claim must establish that the alleged facts are not related to a matter of public concern, and the above analysis disposes of that cause of action as a matter of law.  The test for newsworthiness is whether the allegedly private *facts* conveyed by the "Chart" relate to a matter of public concern, and there is no serious dispute

---

[1] In *Doe*, the Court of Appeal found the disclosure actionable because the plaintiff was a private figure whose personal medical circumstances had nothing to do with what made the subject-matter of the documentary newsworthy.  Here, there is no question that Plaintiff is a high-profile athlete whose individual medical circumstances were highly newsworthy.

that they do.[2]  In fact the newsworthiness test is even broader than that, because it asks whether "the subject-matter of the publicity" (i.e., Plaintiff's injuries and treatment) is a matter of public concern, and whether the facts Schefter disclosed are "substantially related" to that topic, which they plainly are.  *Restatement (Second) of Torts* § 652D, cmt. d.  *See also Florida Star*, 491 U.S. at 436-37 ("the article generally, as opposed to the specific identity contained within it" met that standard); *Toffoloni v. LFP Publ'g Group, LLC*, 572 F.3d 1201, 1208-09  (11th Cir. 2009) (the newsworthiness test addresses "the relationship between the published photographs and the incident of public concern"); *Cinel v. Connick*, 15 F.3d 1338, 1346 (5th Cir. 1994) (videotapes illustrating news report about matter of public concern were "substantially related" to the story); *Shulman*, 18 Cal 4th at 229 ("[t]he challenged material was…substantially relevant to the newsworthy subject matter of the broadcast.").

*Toffoloni*'s analysis illustrates the crux of the issue here.  In that case, the Court held that while news about the plaintiff's murder was newsworthy, nude photographs of her taken twenty years earlier had no connection to the homicide.  By contrast, the Court observed that contemporary photographs of a murdered corpse, even in a case involving a minor, would be protected under prevailing case law as relevant to the homicide.  *Id.* at 1211.  The images in this case, which are far less invasive than anything of that nature, easily qualify as newsworthy.

The test for newsworthiness is not, as Plaintiff implies, whether it was *necessary* to include the Chart, nor is it the role of courts or juries to make that editorial judgment.  *Shulman*, 18 Cal. 4th at 229 ("The standard…is not necessity.  That the broadcast *could* have been edited to exclude some of Ruth's words and images and still excite a minimum degree of viewer interest is not determinative") (emphasis in original).  Thus, the fact that Schefter agrees that journalists could have different opinions about whether they would publish the images is irrelevant.  Opp. 12.  Journalists regularly disagree about matters of editorial judgment, but it is not a tort to do so (rather, it is a sign of a healthy press).  To the contrary, the newsworthiness test is intended to ensure that courts or juries do "not…sit as superior editors of the press." *Shulman*, 18 Cal. 4th at 229; *accord Heath v. Playboy Enterprises Inc.*, 732 F. Supp. 1145, 1149 n.9 (S.D. Fla. 1990) ("[T]he judgment of what is newsworthy is primarily a function of the

---

[2] In that regard, Plaintiff's point that the images of the chart contained more information about his injuries and treatment further supports its news value. Opp. 11-12. Plaintiff also complains that one image may also have contained information pertaining to another patient, Opp. 12, but if so that patient was wholly unidentifiable ("M65").  In any event, that does not impact Plaintiff.

publisher, not the courts"); *Cape Publ'ns v. Bridges,* 423 So. 2d 426, 427 (Fla. 5th DCA 1982) (that a publication "could be considered by some to be in bad taste" does not make it unnewsworthy). Many journalists would likely have debated the wisdom of printing the name of the rape victim at issue in *Florida Star*, or the videotapes of sexual abuse at issue in *Connick*, or the name of the juvenile arrested in *Smith v. Daily Mail Publishing*, 443 U.S. 97 (1979), but that played no role in those courts' conclusions that the information related to matter of public concern.

Plaintiff tries to distinguish the long line of cases holding that courts should not second-guess a reporter's decision to corroborate a news report with tangible evidence by arguing that this principle only applies to reports on government operations or criminal activity. Opp. 9. But newsworthiness is not limited to these subjects. In fact, the concept is "so broad as to nearly swallow the tort" of invasion of privacy, *Cape Publ'ns v. Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989), and it encompasses "any matter of political, social or other concern to the community." *Snyder v. Phelps*, 131 S.Ct. 1207, 1216 (2011) (citation omitted). Courts unanimously recognize that reports about professional athletes qualify as newsworthy. [D.E. 4 at 13 n. 7] (citing cases).

Finally, Plaintiff's contention that the Court should not decide this issue on a motion to dismiss, Opp. 5, is also without merit. Whether a publication relates to a matter of public interest may properly be determined as a matter of law, *Hitchner*, 549 So. 2d at 1379, and Florida courts have not hesitated to make this determination at the motion to dismiss stage. *See, e.g., Valentine v. CBS, Inc.*, 698 F.2d 430, 433 (11th Cir. 1983); *Walker v. Fla. Dep't of Law Enforcement*, 845 So. 2d 339 (Fla. 3d DCA 2003). Indeed, early dismissal is particularly important in cases that involve reports on matters of public concern. As one Florida federal court held in dismissing a claim on newsworthiness grounds:

> Were the Court to have waited until a later stage in this litigation to make what has proven to be an exceedingly easy decision, the cost might well have been a high one for publishers, writers, and, indeed, for the right to speech itself. In constitutional parlance, the specific risk would have been to chill the speech, not merely of Defendant, but of all writers and publishers who happen to offend the subjects of their publications.

*Mills v. Wenner Media, LLC*, No. 05-00132, 2005 WL 1126662, at *2 (M.D. Fla. May 5, 2005).

### B.     The Florida Medical Privacy Statute Provides No Cause of Action

#### 1)     The Medical Privacy Statute Does not Apply to Defendants

Plaintiff argues that Defendants do "not cite to a single case supporting [their] position" that Fla. Stat. § 456.057(11) does not apply to everyone in the world. Opp. 15. To the contrary, Defendants cited multiple lines of authority showing that (1) Florida courts recognize that statute's primary purpose is to regulate health care professionals, [D.E. 4 at 8-9]; (2) Florida courts have only applied the statute to those "third parties" who are authorized recipients of statutory disclosures, such as state actors, [*id.* at 8]; (3) *State v. Crumbley*, 143 So. 3d 1059 (Fla. 2d DCA 2014) recognized that the statute "does not prevent an ordinary citizen from exercising his or her First Amendment right to call a doctor's office seeking information about a patient," [*id.* at 1067]; and (4) courts in other jurisdictions have uniformly rejected arguments that similar statutes should be construed to impose restrictions on the speech of the general public, including journalists. [D.E. 4 at 10] (citing cases).

Tellingly, it is Plaintiff who does not respond to any of this authority, nor does he cite a single case even implying that the statute applies to the general public. The only case he does cite, *Daw v. Cowan*, No. 11-00096, 2013 WL 5838683 (N.D. Fla. Oct. 30, 2013), supports Defendants' interpretation because it suggests only that the statute might apply, "in some circumstances," to non-physicians who are also state actors. *Id.* at *9. The defendants in Daw were investigators working for the State, and so they were within the category of third parties involved in law enforcement that some Florida cases have held can, and must, obtain medical records only pursuant to a statutory disclosure. *See, e.g.,* Fla. Stat. § 456.057(7)(a)(3); *Mullis v. State*, 79 So. 3d 747 (Fla. 2d DCA 2011).

Plaintiff next contends that the plain meaning of the statute supports his position. Opp. 15. But what he really means is his construction of the plain meaning of a single sentence excised from the statute and read in isolation. This ignores the rule that the plain meaning of statutory text "must be derived from the context in which the language lies." *Miele v. Prudential-Bache Securities, Inc.*, 656 So. 2d 470, 472 (Fla. 1995). Read in context, it is clear that § 456.057(11) merely completes the scheme of rights and obligations the statute imposes on healthcare providers and third-party recipients of statutory disclosures.

In fact, Plaintiff's construction makes no sense even considering only the language of § 456.057(11). The first sentence of that section requires healthcare providers to keep records of

their disclosures of medical information "to a third party." This obviously refers only to third parties to whom the statute authorizes such disclosures; otherwise, the sentence would have the absurd purpose of requiring providers to keep meticulous records of their own law-breaking.

Finally, in order to try to explain away the absurd results his interpretation of the statute would produce, Plaintiff's arguments end up abandoning his own construction of the law's "plain meaning." Thus, he contends that the statute would not constrain the media from reporting about an incapacitated governor because "no one would dispute the newsworthiness of" that and it would also depend on "the manner by which the journalist obtained that information." Opp. 16. But § 456.057(11) contains no newsworthiness exception, nor does its application turn on differences in newsgathering techniques.[3]

        2)        The Court Should not Read a Private Right of Action into the Statute

Plaintiff's argument that he has standing to enforce the legislation is based on two misconceptions. First, his argument that "[t]here is no basis to bar Plaintiff's private right of action," Opp. 17, gets the analysis backwards. Where, as here, a statute does not contain an explicit private right of action, there is a strong presumption *against* judicially inferring one, *Fla. Physicians Union v. United Healthcare of Fla.*, 837 So. 2d 1133, 1157 (Fla 5th DCA 2003), and federal courts "should be particularly reluctant" to take that step, *Zarella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1228 (S.D. Fla. 2010).

Second, if a gap does exist in the public enforcement scheme provided by the Legislature, Opp. 17, it is not the court's role to fill it with a private right of action. *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 553 (Fla. 2012) ("[C]ourts cannot provide a remedy where the Legislature has failed to do so."). Plaintiff's argument to the contrary is not based on any indication of legislative intent, and is inconsistent with his own position that "[i]t is not the role of the judiciary, especially a federal court, to rewrite a state statute." Opp. 16. Plaintiff also does not even attempt to explain how a private right of action would fit with the fact the provision at issue is found in a chapter that expressly "applies only to the regulation by the [Department of Health] of professions," Fla. Stat. § 456.002, or why this

---

[3] Far from being "inappropriate", Opp. 16, Defendants' analogy to a member of the media discovering that Florida's governor was medically incapacitated is entirely apt. A star athlete who conceals his inability to perform on the field is, in sports terms, much like a politician who conceals impediments to performing his official duties.

Court should not construe the Florida medical privacy law in the same way courts including the Eleventh Circuit have construed HIPAA.

## II.  THE FIRST AMENDMENT WOULD ALSO BAR ANY CLAIM RECOGNIZED BY FLORIDA LAW

Even if Plaintiff did state a claim under Florida law, that claim would be barred by the First Amendment doctrine that prohibits punishment of a defendant for publishing "lawfully obtain[ed] truthful information about a matter of public significance…absent a need to further a state interest of the highest order." *Florida Star*, 491 U.S. at 533 (quoting *Smith*, 443 U.S. at 103). As established in Defendants' Motion and above, Mr. Schefter's publication of the images at issue related to a matter of public significance. As a result, much of the Opposition argues that Schefter "unlawfully obtained" the records, an allegation that appears nowhere in the Complaint. Opp. 5-9. The Court need not reach this issue unless it finds the Complaint states a claim under Florida law, but if it does reach this issue it would make no difference. Plaintiff offers two mutually contradictory theories as to why Schefter supposedly "unlawfully obtained" information, both of which are in any event wrong as a matter of law.

First, Plaintiff argues that Schefter broke the law by "accept[ing] information from a source with knowledge of the illegality of the source's disclosure." Opp. 5. In other words, Plaintiff argues that because the hospital violated § 456.057 when it allegedly disclosed the records to Schefter, Schefter "unlawfully obtained" the records because he accepted them knowing the hospital was breaking the law. This proposition is wrong, for two reasons.

Even at first blush, it is wrong because even under Plaintiff's construction, § 456.057 prohibits *disclosing* protected medical information, not seeking or acquiring it. *See Crumbley*, 143 So. 3d at 1067. In *Florida Star*, the Supreme Court rejected the identical argument Plaintiff makes here, because the statute at issue in that case likewise only proscribed disclosure, not the mere receipt of information. 491 U.S. at 536.

More broadly, forty decades of First Amendment case law has consistently held that a journalist does not unlawfully obtain information by allegedly accepting it with knowledge that a source's disclosure was illegal. And for good reason – otherwise, journalists would essentially become policemen to enforce the confidentiality obligations of their sources. Rather, in order for information to qualify as "unlawfully obtained" for First Amendment purposes, *the journalist* – and not just the source – must have broken some law by the manner in which he or she physically obtained the information.

The Supreme Court's decision in *Bartnicki* is directly on point.  In that case, one of the defendants received a tape of a telephone conversation that he knew, or should have known, had been illegally disclosed to him (as well as illegally recorded) under state law.  532 U.S. at 517-18, 525.  The tape was then passed to a radio station, which likewise knew, or should have known, of the illegal disclosure.  But the Court held that the defendants' "access to the information on the tapes was obtained lawfully", because accepting information with knowledge of a source's illegal disclosure is not unlawful.  *Id.* at 525.  And both before and after *Bartnicki*, the Supreme Court and numerous other courts have similarly rejected attempts to hold the press liable for publishing information, that, allegedly, was knowingly received from a source who was barred from disclosing it.[4]

Plaintiff's other theory is that "Schefter knew [the image] was *stolen* when he received it", Opp. 7 (emphasis added).  But that completely contradicts Plaintiff's preceding theory, as well as the Complaint.  The Complaint alleges, and, as discussed above, Plaintiff argues, that Schefter received the chart directly from the hospital (which lawfully possesses the records), not from a third party who "stole" it from the hospital.  Compl ¶¶ 16, 27, 29**.**  If Schefter's source

---

[4] *See, e.g., Landmark Commc'ns, Inc. v. Virginia,* 435 U.S. 829, 842 (1978) (First Amendment protected newspaper's right to report information about judicial disciplinary proceedings that source was not legally permitted to disclose); *Palm Beach Newspapers, LLC v. State,* 183 So. 3d 480, 484 (Fla. 4th DCA 2016) (newspaper had First Amendment right to publish transcripts of inmate conversations, because even if newspaper "got the information through the Government's violation of [inmate's] right to privacy" it did not acquire them unlawfully); *Seminole Tribe of Fla. v. Times Publ'g Co.*, 780 So. 2d 310, 315 (Fla. 4th DCA 2001) (dismissing tortious interference claim that reporters solicited the disclosure of confidential proprietary documents because that "is not the type of conduct" that is properly the subject of interference theories); *Jean v. Mass. State Police,* 492 F.3d 24, 32-33 (1st Cir. 2007) (First Amendment protected online posting of illegal recording notwithstanding allegation that poster was in "active collaboration" with source); *Zerilli v. Evening News Ass'n*, 628 F.2d 217, 222-24 (D.C. Cir. 1980) (no *Bivens* claim lay against a reporter who allegedly conspired with federal officials to procure confidential transcripts of illegal wiretaps because "holding a newspaper liable in damages for uncovering and publishing information that it deems newsworthy" would be inconsistent with "[t]he values served by a free and vigilant press."); *Rain CII Carbon, LLC v. Kurczy*, Case No. 12-02014, 2012 WL 3577534, at *6 (E.D. La. Aug. 20, 2012) (allegation that defendant journalist knew source was breaching a duty to keep trade secrets confidential was insufficient to vitiate First Amendment protections); *Nicholson v. McClatchy Newspapers*, 223 Cal. Rptr. 58, 64 (Cal. Ct. App. 1986) (the First Amendment precludes tort claims against the press for "soliciting, inquiring, requesting and persuading agents, employees and members of the State Bar to engage in the unauthorized and unlawful disclosure of information").

was someone who "stole" it from the hospital, Defendants could not be liable because under any construction of § 456.057(11) the statute only covers third parties who obtain records from healthcare providers – not downstream recipients of medical information.[5]

In any event, none of this matters because even if Schefter knew or suspected that someone stole the images, the Supreme Court's First Amendment jurisprudence makes clear that such knowledge would not render his obtaining the images unlawful either.  Here too, *Bartnicki* is squarely on point, because the plaintiffs in that case likewise alleged that the tape at issue had been illegally recorded by a source and therefore was like stolen property.  The Court rejected that argument, holding that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern."  *Id.* at 535.

Finally, *Boehner v. McDermott* also squarely rejects Plaintiff's position.  Plaintiff relies heavily on the district court's opinion in *Boehner*, Opp. 5-6**,** but omits that its reasoning was rejected by the D.C. Circuit on appeal.  *See* 484 F.3d 573 (D.C. Cir. 2007) (en banc), *cert. denied*, 552 U.S. 1072 (2007).  A majority of that court held that "the otherwise-lawful receipt of

---

[5] In fact, that was among the arguments that both of Plaintiff's law firms made, successfully, in the only other case we are aware of to test the application of § 456.057(11) to third parties who are not state actors. In *Collazo v. Rodriguez*, which is still being litigated, the plaintiff claimed under a negligence per se theory that baseball's Alex Rodriguez and other defendants violated § 456.057(11) by disclosing to federal authorities medical records he had purchased from someone who stole them from the Biogenesis operation.  Plaintiff's Florida counsel represents Rodriguez in that case, and his other counsel represents a co-defendant.  Rodriquez argued (in a motion other defendants also joined) that "Chapter 456 regulates health professions and occupations, and applies only to individuals regulated by the Florida Department of Health."  Rodriguez Motion to Dismiss at 4, *Collazo v. Rodriguez*, No. 2015-013387 (Fla. Cir. Ct.) (attached as Ex. A); *see also* Transcript of Hearing at 13:18-21 (attached as Ex. B) ("The statute very clearly indicates – and I've cited to Section 456.001 and 456.002 that says that this statute applies only to healthcare professionals.").  Rodriquez also argued that in any event, "the theft of the record by [Rodriquez's source] ends the application of Chapter 456 to Plaintiff's record." *Id.* at 6.  Rodriquez was successful on those points, as the Circuit Court dismissed all claims based on § 456.057, holding that "these defendants do not owe any type of duty pursuant to that statute . . . 456.057." Ex. B at 43:4-6.   Nonetheless, we recognize that *Rodriquez* is a preliminary state trial court decision that has little precedential value.  The same is true with respect to the Hulk Hogan trial verdict Plaintiff references, except (1) that case is not about medical records, and (2) even if it were that case actually has established some precedent to date, and it would not be helpful to Plaintiff. *See Gawker Media, LLC v. Bolleas*, 129 So. 3d 1196, 1201-03 (Fla. 2d DCA 2014) ("It is clear that . . . the report and the related video excerpts address matters of public concern" & "the speech is protected by the First Amendment . . . even if the source recorded it unlawfully").

unlawfully obtained information remains in itself lawful, even where the receiver knows or has reason to know that the source has obtained the information unlawfully." *Id.* at 585 (Sentelle, J.). A majority also explicitly held that newspapers like *The New York Times* that received the tape from McDermott, and were therefore in the same position as ESPN is here, could not constitutionally be punished for sharing it with the public. *Id.* at 586.[6]

Plaintiff also claims that he is entitled to discovery in order to find out whether, for instance, Defendants paid for the charts, even though he implicitly admits he has no good-faith basis to even allege that. Opp. 5. But this "put[s] the proverbial cart before the horse," because Plaintiff has presented no plausible claim upon which to seek discovery. *SIG, Inc. v. AT&T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1192 (S.D. Fla. 2013). Only sufficiently-pled allegations "unlock the doors of discovery", and there are none here. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That principle is especially important to apply here, where a celebrity athlete essentially claims the right to conduct a witch hunt into a reporter's sources and newsgathering because a news organization did not appropriately "protect" his image.

Finally, Plaintiff also disputes the applicability of Florida's anti-SLAPP statute, but his argument is no different than his position on the merits. Moreover, the fact that Plaintiff elected to disregard the rules of civil procedure by attaching irrelevant materials in order to use his Opposition as a forum to launch a personal attack on a journalist whose reporting about him he obviously dislikes, Opp. 2-3, reinforces why this is exactly the kind of case the SLAPP statute is directed at. In any event, since that statute only becomes relevant if Defendants prevail on this motion and subsequently seek attorneys' fees, there is no need to address it further now.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that their motion to dismiss be granted and that the Complaint be dismissed, with prejudice.

---

[6] Judge Griffith joined four dissenters in forming the majority on those points. 484 F.3d at 581 (Griffith, J., concurring). A different majority held McDermott liable only because, as a member of House Ethics Committee, he had assumed a special duty not to disclose information provided to the House. *Id.* Schefter occupies no analogous position here.

Dated:  May 16, 2016

Respectfully submitted,

THOMAS & LoCICERO PL
401 SE 12th Street, Suite 300
Fort Lauderdale, FL  33316
Phone:  (954) 703-3416
Fax:  (954) 400-5415

By: */s/ Deanna K. Shullman*
   Deanna K. Shullman
   Florida Bar No. 514462
   Allison S. Lovelady
   Florida Bar No. 70662

and

LEVINE SULLIVAN KOCH & SCHULZ LLP

Nathan Siegel *(admitted pro hac vice)*
nsiegel@lskslaw.com
Adam Lazier (*admitted pro hac vice*)
alazier@lskslaw.com
1899 L Street, NW  Suite 200
Washington, DC 20036
Phone:  (202) 508-1100
Fax:  (202) 861-9888

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Reply Memorandum of Law In Support of Defendants' Motion to Dismiss the Complaint was served by CM/ECF on **May 16, 2016** on all counsel in the below service list.

/s/ *Deanna K. Shullman*
Deanna K. Shullman

## SERVICE LIST

John C. Lukacs, Sr., Esq.
jlukacs@hinshawlaw.com
Hinshaw & Culbertson LLP
2525 Ponce de Leon Blvd
4th Floor
Coral Gables, Florida 33134
Telephone: 305-358-7747
Facsimile: 305-577-1063

Mitchell Schuster, Esq.
ms@msf-law.com
Kevin Fritz, Esq.
kaf@msf-law.com
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: 212-655-3570
Facsimile:  212-655-3535